**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **MAUREEN KITCHEN AND JOSH KITCHEN,**<br><br>Plaintiffs,<br><br>v.<br><br>**MYRIAD GENETICS, INC., MYRIAD GENETIC LABORATORIES, INC.,**<br><br>Defendants. | ) | **CASE NO. _______________**<br><br>**COMPLAINT AND JURY DEMAND** |

The Plaintiffs, Maureen Kitchen and Josh Kitchen ("Maureen" and "Josh", or the "Plaintiffs"), by and through the undersigned counsel, and for their Complaint against Defendants Myriad Genetics, Inc. and Myriad Genetic Laboratories, Inc. (collectively "Myriad" or the "Defendants"), state and allege as follows:

1. Maureen Kitchen is a natural person and United States citizen residing in Omaha, Douglas County, Nebraska.

2. Josh Kitchen is Maureen Kitchen's husband, a natural person, a United States citizen, and resident in Omaha, Douglas County, Nebraska.

3. Myriad Genetics, Inc. is incorporated in Delaware, with its principal place of business in Utah.

4. Myriad Genetic Laboratories, Inc. is incorporated in Delaware, with its principal place of business in Utah.

5. Myriad Genetic Laboratories, Inc. is registered to do business in Nebraska as a foreign corporation and shares the same address for its principal place of business that Myriad

Genetics, Inc. has listed as its principal place of business in its most recent filings with the United States Securities and Exchange Commission.

6. Upon information and belief, the Defendants have combined, acted jointly, acted in concert, or acted one on behalf of another, to cause the acts and omissions alleged in this Complaint, wholly incorporated herein by reference.

7. This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1332 because the Defendants' citizenship is diverse from that of Plaintiffs, and the amount in controversy exceeds $75,000.

8. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mrs. and Mr. Kitchen's claims occurred in this district.

## BACKGROUND

### <u>Myriad and MyRisk</u>

9. Myriad, a genetic testing company and laboratory, gained prominence in the 1990s for locating and sequencing the breast cancer susceptibility genes commonly known as BRCA1 and BRCA2 (together "BRCA1/2"). Mutations in BRCA1/2 are among the markers used to identify a patient's susceptibility to developing cancer of the breast or ovaries.

10. Myriad's patented methods and materials are used, among other purposes, to screen cancer-predisposing genes for mutations for the purpose of assessing a customer's risk for developing breast cancer or ovarian cancer.

11. Myriad positioned itself as a leader in the field of genetic testing and screening for a patient's susceptibility to developing cancer, in part by defending its patents related to BRCA1/2 and the exclusivity rights created by the patents.

12. Building on its claimed success in mapping and locating BRCA1/2, Myriad mapped and located other genes associated with cancer risk.

13. In 2013, Myriad lost several patents related to BRCA1/2 because the Supreme Court of the United States ruled these naturally occurring phenomena were not patent eligible.

14. Myriad expanded its focus from BRCA1/2 and used the fruit of its exclusive patents, specifically an extensive database and revenue, to develop new products to introduce to the genetic testing market.

15. In 2013, Myriad debuted its MyRisk Hereditary Cancer test ("MyRisk"), a multi-gene diagnostic test that analyzed 25 genes associated with eight major hereditary cancers.

16. Over the years, the MyRisk test has expanded in scope and presently analyzes 63 genes linked to 11 common cancers.

**<u>The "VUS" Problem</u>**

17. Using revenues secured by protecting the exclusive use of the BRCA1/2 patents, Myriad made very large investments and leveraged its enormous, centralized mutation database based on clinical testing to begin solving "the 'VUS' problem."

18. A variant of uncertain significance ("VUS") is a sequence variant for which the available evidence is insufficient or conflicting regarding its disease association.

19. "The 'VUS' problem" is, at least in part, the fact that so many genetic variants are known and identified, but the clinical effects of these variants are not known. "Solving the problem" by resolving uncertain classifications can improve cancer-risk assessment and clinical management, including avoiding interventions unsupported by the genetic evidence.

20. Specific mutations can bear differing clinical significance for assessing a patient's risk for developing a certain type of cancer. Myriad uses the following classifications:

a. Deleterious;

b. Suspected deleterious;

c. VUS;

d. Suspected benign; and

e. Benign.

21. Variants of uncertain significance may subsequently be reclassified as additional evidence becomes available. In a published study of hereditary cancer testing performed at Myriad, 91.2% of unique VUS that underwent reclassification were downgraded to benign or likely benign.[1]

22. In 2013, Myriad began an aggressive campaign to reclassify VUS using its proprietary "MyVision Variant Reclassification Program" ("MyVision"), a component of the MyRisk test and of the formulation of the RiskScore (a predictive tool indicating the patient's relative risk when compared to the general population).

23. Myriad designed, created, branded, marketed, sold, and otherwise delivered MyVision into the stream of commerce as a component feature of MyRisk.

24. MyVision is a multi-prong program consisting of several components. The proprietary components are:

a. A personal and family history-weighting algorithm called "Pheno";

b. A mutation co-occurrence statistical analysis used to discover benign variants, called "M-CO";

---

[1] Jacqueline Mersch et al., *Prevalence of Variant Reclassification Following Hereditary Cancer Genetic Screening*, 320 JAMA 1266, 1271 (2018), https://jamanetwork.com/journals/jama/fullarticle/2703350.

25. The other components of MyVision are techniques "enhanced" by Myriad and include a literature review process branded as "LitView," and an RNA/splice analysis branded "InSite."

26. At all times relevant to the allegations herein, wholly incorporated by reference, Myriad's reclassification efforts are completed primarily with its proprietary tools, as a 2025 Myriad brochure[2] excerpt shows:




27. Myriad boasted to healthcare providers that MyVision allows Myriad to provide the "most accurate, clinically actionable results for your patients."

---

[2] MYRIAD GENETICS, MYRISK VUS BROCHURE (2025), https://myriad-web.s3.amazonaws.com/myRisk/MyRisk+-+HCP+VUS+Brochure.pdf (accessed from https://myriad.com/resources by filtering by test to "MyRisk," select second page).

28. The same 2025 brochure excerpted in paragraph 26 shows Myriad uses lower VUS classification rates as a selling point and product feature:

**More answers for your patients with industry-leading variant classification**

VUS rates for key breast cancer genes[20]

| Gene | 2016 | ➤ | 2019 | ➤ | 2023 |
|---|---|---|---|---|---|
| *ATM* | 4.70% | ➤ | 3.10% | ➤ | 2.70% |
| *BARD1* | 1.60% | ➤ | 0.80% | ➤ | 0.60% |
| *BRCA1* | 0.50% | ➤ | 0.30% | ➤ | 0.30% |
| *BRCA2* | 1.10% | ➤ | 0.90% | ➤ | 0.70% |
| *CDH1* | 1.60% | ➤ | 1.20% | ➤ | 1.10% |
| *CHEK2* | 2.50% | ➤ | 1.50% | ➤ | 1.30% |
| *PALB2* | 1.20% | ➤ | 0.70% | ➤ | 0.50% |
| *PTEN* | 0.30% | ➤ | 0.20% | ➤ | 0.10% |
| *RAD51C* | 1.10% | ➤ | 0.90% | ➤ | 0.30% |
| *RAD51D* | 1.00% | ➤ | 0.90% | ➤ | 0.90% |
| *STK11* | 0.70% | ➤ | 0.50% | ➤ | 0.50% |
| *TP53* | 0.60% | ➤ | 0.60% | ➤ | 0.60% |

**The MyRisk test delivers the industry's lowest reported VUS rate for *BRCA1* and *BRCA2* of 0.3% and 0.7, respectively.[20]**

Grid displays select critical genes with longitudinal data for VUS detection.

29. Myriad purposefully and voluntarily targets healthcare providers and patients in Nebraska to maintain and grow its market share in genetic testing, tumor profiling, and companion diagnostic solutions.

30. Myriad designed, created, branded, marketed, sold, and otherwise delivered into the stream of commerce MyRisk Hereditary Cancer testing, which is supported by or incorporates MyVision and its proprietary components, which Myriad has also designed, created, branded, marketed, sold, and otherwise delivered into the stream of commerce.

31. Upon information and belief, Myriad's Variant Classification Program is a newer iteration of its MyVision product and incorporates many, if not all, of the same proprietary components.

**Maureen Kitchen's MyRisk Testing**

32. Maureen Kitchen is a registered nurse who lives and works in Omaha, Nebraska. She is a married mother of four biological children and was the gestational carrier for three more children.

33. During a routine gynecological visit in 2024, Maureen's midwife at Mid-City OB-GYN recommended a genetic screening based on her family history of cancer.

34. Maureen submitted a blood sample to Myriad for analysis.

35. Upon information and belief, Myriad is Mid-City OB-GYN's exclusive genetic testing provider.

36. The results Myriad provided to Maureen reported that Mrs. Kitchen was heterozygous for the ATM sequence variant NM_000051.3:c.6975G>C (p.Ala2325Ala), also described as p.Ala2325= ("ATM-gene mutation").

37. Multiple clinical laboratories classified Maureen's ATM-gene mutation as a VUS at the time Myriad provided the result identified in the previous paragraph.

38. Myriad classified Maureen's ATM-gene mutation in 2024 using MyVision and its proprietary components.

39. In MyRisk Genetic Result and Management Tool dated October 23, 2024 ("2024 Report"), Myriad classified Maureen's ATM-gene mutation as "suspected deleterious," reported her genetic test result as "POSITIVE," and identified the variant as clinically significant. The report assigned a "HIGH RISK" interpretation for ATM-associated cancer risk.

40. In the 2024 Report, Myriad stated that its internal RNA-splicing studies demonstrated aberrant splicing, which was predicted to cause a frameshift and premature protein truncation.

41. Maureen learned of Myriad's conclusions when she read Myriad's 2024 Report, which featured:

a. Large red and white symbols indicating a positive result because Myriad identified a clinically significant mutation;

b. Identification of a "HIGH RISK" for breast and pancreatic cancer set in a red box;

c. A statement that "NO VARIANT(S) OF UNCERTAIN SIGNIFICANCE (VUS) WERE IDENTIFIED";

d. A statement that the ATM-gene mutation was "Suspected Deleterious" based on a prediction founded on Myriad internal data;

e. A statement that Myriad's internal RNA-splicing studies demonstrated aberrant splicing, which Myriad predicted would cause a frameshift and premature protein truncation;

f. Multiple affirmative statements that the ATM-gene mutation was associated with increased cancer risk; and

g. Indication that Mrs. Kitchen's breast cancer risk was over four times that of a person in the general population up to age 50.

42. Maureen was 47 years old when she received the 2024 Report.

43. In December 2024, Maureen Kitchen underwent a bilateral mammogram, and no suspicious malignancy was identified.

44. In June 2025, Maureen Kitchen underwent bilateral breast magnetic resonance imaging (MRI), and no suspicious malignancy was identified.

45. Still very concerned about the MyRisk test results and Myriad's classification of her ATM-gene mutation as "clinically significant," Maureen Kitchen presented for consultation at the Breast Care Center at Methodist Hospital to discuss reduction strategies.

46. During her breast clinic consultation, Maureen received counseling regarding enhanced breast surveillance considering her reported ATM result and family history. She was referred for breast and reconstructive surgical consultations to discuss those options and was referred to gynecologic oncology to discuss the risks and benefits of risk-reducing bilateral salpingo-oophorectomy.

47. All consulting physicians concurred that a prophylactic bilateral mastectomy was a clinically appropriate intervention given the combination of Mrs. Kitchen's family history and the positive test results from Myriad.

48. Maureen would not have elected to have prophylactic bilateral mastectomy based on her family history alone. The 2024 Report of Myriad's conclusions regarding her ATM-gene mutation materially influenced her decision.

49. Maureen would not have elected to have prophylactic bilateral salpingo-oophorectomy based on her family history alone. The 2024 Report of Myriad's conclusions regarding her ATM-gene mutation materially influenced her decision.

50. Maureen Kitchen would not have undergone any prophylactic surgeries solely based on her family history. Myriad's classification of the ATM-gene mutation and its associated cancer-risk interpretation were essential factors in Mrs. Kitchen's decision to undergo these surgeries.

51. Myriad's classification of Maureen's ATM-gene mutation as "HIGH RISK," as reported to her in the 2024 Report, was incorrect.

52. Myriad's classification of Maureen's ATM-gene mutation, as reported to her in the 2024 Report, was not adequately supported by evidence available at that time.

53. Myriad's classification of Maureen's ATM-gene mutation, as reported to her in the 2024 Report, departed from the VUS classification multiple other laboratories had already assigned the ATM-gene mutation at the time Myriad made the classification.

54. As a direct and proximate result of Myriad's misclassification of Maureen's ATM-gene mutation and the assessment reporting the same, Maureen Kitchen believed she was at a higher risk of developing breast cancer than the risk posed by her family history alone.

55. Maureen's medical providers considered the reported ATM result in assessing her cancer risk and discussing management options. Myriad's clinically actionable interpretation materially influenced those discussions and the subsequent surgical decision-making.

56. Maureen believed that Myriad's assessment was reliable, and Maureen's belief was foreseeable and justifiable.

57. Maureen's medical providers believed the 2024 Report was reliable, and their belief was foreseeable and justifiable. Myriad anticipates and invites patients and healthcare providers to rely on Myriad's expertise, MyRisk test results, and variant classifications.

58. Mrs. Kitchen's reliance on the 2024 Report and her belief in her "HIGH RISK" of developing breast cancer caused her severe mental anguish because a cancer diagnosis would be life-altering, affecting the psychological, physical, emotional, social, and financial aspects of her life.

59. Many women who are at risk of developing breast cancer undergo prophylactic mastectomy.

60. Prophylactic oophorectomy is considered in selected hereditary cancer syndromes to reduce tubo-ovarian cancer risk.

61. Maureen relied on Myriad's classification of the ATM-gene mutation and the purported associated cancer-risk information when evaluating her management options with her healthcare providers and when deciding to proceed with surgery.

62. Maureen underwent prophylactic bilateral mastectomy and prophylactic bilateral salpingo-oophorectomy on December 3, 2025.

63. More simply put, on December 3, 2025, Maureen had her breasts and ovaries removed because she relied on Myriad's classification of her ATM-gene mutation as "clinically significant" and putting her at "HIGH RISK."

64. Following the surgery, Maureen was kept in the hospital overnight and discharged the next day. She was instructed not to drive for two weeks. She went home with four Jackson-Pratt drains sutured to her sides, which were not removed until two weeks later. During this time, she was unable to shower, her limited range of motion prevented her from washing her hair, and her sleep was poor and uncomfortable.

65. Maureen was out of work for six weeks after the December 2025 surgery due to restrictions on her abilities. At this time, Maureen underwent reconstruction of her breasts, which left her in pain after each session.

66. Maureen was pre-menopausal before the prophylactic bilateral salpingo-oophorectomy. Maureen entered surgical menopause and experienced full menopausal

symptoms for a few months before beginning hormone replacement therapy. Maureen continues hormone replacement therapy.

67. While Maureen has a family history of cancer, she would not have undergone a prophylactic bilateral mastectomy or prophylactic bilateral salpingo-oophorectomy if Myriad classified her ATM-gene mutation as a VUS.

68. On January 23, 2026, mere weeks after the December surgeries, Myriad furnished Mrs. Kitchen with an amended report of her genetic testing results ("2026 Amended Report").

69. The 2026 Amended Report informed Mrs. Kitchen that Myriad misclassified her ATM-gene mutation in 2024, and Myriad now considered the mutation to be a VUS.

70. The Amended Report reclassified the ATM-gene mutation from "suspected deleterious" to VUS because Myriad identified the mutation in trans in adults with another pathogenic ATM variant but no features of ataxia-telangiectasia, creating uncertainty regarding the ATM-gene mutation's pathogenicity.

71. What might otherwise have been a relief became a source of further anguish for Maureen Kitchen as she had already undergone irreversible surgeries to remove her breasts and ovaries in reliance on the 2024 Report.

72. As a result of the reclassification in the 2026 Amended Report, Maureen also experienced severe anxiety as she wondered if her insurance carrier would deny claims for her reconstructive surgery considering the 2026 Amended Report's reclassification.

73. In April 2026, Maureen Kitchen was able to undergo reconstructive surgery. It was excruciating and caused significant ecchymosis along her abdomen, thighs, and flanks.

74. Maureen Kitchen's movement was painful and restricted. She was once again prevented from working her hospital job for six weeks. Because she had used her time off for the first surgery, Maureen had to pay her insurance premiums out of pocket.

75. Maureen required an additional fat grafting surgery in September 2026, related to her breast reconstruction procedures.

76. The implants placed in Maureen's chest will require continued monitoring by ultrasound to detect any potential ruptures. Maureen's healthcare providers expect her to require another surgery to replace the implants at some point in the future.

77. Myriad and its initial misclassification of the ATM-gene mutation caused Maureen Kitchen misery. She had to face her own mortality as she weighed whether she should continue living with her body intact and risk developing a potentially fatal cancer. She ultimately decided to remove those vital parts of her body, which has resulted in loss of feeling in her breasts, hormone therapy, reconstructive procedures, and the stressful psychological impact on her and her family. All this because of Myriad's inadequately supported classification. Upon information and belief, Myriad failed to correct its 2024 Report within a reasonable time.

78. If Maureen had received the information contained in the 2026 Amended Report before her surgeries, she would not have undergone the surgeries.

## CAUSE OF ACTION ONE: NEGLIGENCE OR NEGLIGENT UNDERTAKING (MAUREEN KITCHEN'S CLAIM)

79. Mrs. Kitchen restates and realleges each preceding paragraph as if set forth fully herein.

80. Myriad holds itself out as a reliable laboratory providing accurate genetic testing results and classification of VUS for the purpose of helping healthcare providers and patients make better informed decisions regarding interventions for cancer risks.

81. Myriad voluntarily and affirmatively undertakes to perform genetic testing and provide patients and healthcare providers with results upon which they and their medical providers can rely to aid in their medical decision-making.

82. Myriad provides genetic testing and classifies variants for profit, and when it agrees to conduct genetic testing for a patient, even if through a healthcare provider, the testing, classification, and reporting of the results and variant classification must be done with care and skill.

83. Myriad had exclusive control of the genetic testing procedures and used its own proprietary tools to classify Maureen Kitchen's ATM-gene mutation and assess her cancer risk.

84. Myriad performed the genetic testing and was responsible for the ATM-gene mutation classification, interpretation, and report. Myriad's interpretation was supported by RNA-splicing studies, evidence it developed.

85. Myriad assigned excessive evidentiary weight to its RNA-splicing findings and insufficient weight to other relevant evidence when classifying the ATM-gene mutation as clinically significant.

86. Myriad failed to exercise reasonable care in one or more of the following ways: by misclassifying Maureen's ATM-gene mutation; by overstating the ability of Myriad's testing to identify and classify gene mutations; misevaluating the strength and limitations of its RNA-splicing evidence; failing to integrate relevant clinical, genetic, and published evidence; assigning and maintaining the ATM-gene mutation's classification as clinically significant; by incorrectly or negligently administering the genetic testing procedures; by failing to properly supervise or train employees; failing to timely reassess the classification; failing to timely

recharacterize the ATM-gene mutation when the evidence warranted a change; and failing to timely communicate the reclassification.

87. Myriad's negligence directly and proximately caused Maureen Kitchen's damages.

88. Myriad damaged Maureen Kitchen by causing her:

a. To undergo the prophylactic bilateral mastectomy and salpingo-oophorectomy she would not have undergone had her ATM-gene mutation been classified as a VUS;

b. Past and future mental anguish, to include intense anxiety, deep feelings of loss and grief, and mental pain and suffering related to her physical injuries;

c. Short-term physical ailments, including loss of mobility and range of motion limitations, weakened upper body, difficulty lifting and reaching, and surgical menopause;

d. Permanent physical disabilities and disfigurement, including the loss of feeling in her breasts, the loss of her breasts, and the loss of her ovaries.

89. Myriad further damaged Maureen Kitchen by causing her not less than $226,688.97 in special damages, the full amount to be proven at trial, and general damages to be proven at trial.

**CAUSE OF ACTION TWO: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (MAUREEN KITCHEN'S CLAIM)**

90. Maureen restates and realleges each preceding paragraph as if fully set forth herein.

91. Producing genetic testing results for patients and healthcare providers is a situation with a very high potential to cause emotional distress if the results furnished are incorrect.

92. Myriad holds itself out as an industry leader and invites patients and healthcare providers to rely on its genetic testing results and variant classifications.

93. After receiving the 2024 Report, Maureen Kitchen experienced mental and emotional harms that led her to take increased preventive measures related to her perceived cancer risk.

94. Myriad negligently assigned a clinically actionable interpretation to the detected ATM-gene mutation without sufficient supporting evidence in the 2024 Report, which directly and proximately caused Maureen mental and emotional harms, which directly and proximately caused her to undergo prophylactic bilateral mastectomy and salpingo-oophorectomy.

95. Because of Myriad's negligence, Maureen Kitchen is entitled to an award of general and punitive damages to be proven at trial.

**CAUSE OF ACTION THREE: NEGLIGENT MISREPRESENTATION (MAUREEN KITCHEN'S CLAIM)**

96. Maureen restates and realleges the preceding paragraphs as if fully set forth herein.

97. Myriad undertook to provide Maureen reliable classifications of her genetic mutations.

98. Myriad negligently misrepresented the ATM-gene mutation as clinically significant and associated with increased cancer risk when the evidence available at the relevant time did not adequately support the interpretation. Myriad also misrepresented the ability of its genetic testing to identify clinically significant genetic mutations.

99. Directly and proximately due to its negligence, Myriad provided Maureen with false information when it misclassified her ATM-gene mutation.

100. Maureen and her healthcare providers discussed Maureen's medical options after assessing her risk in reasonable and justifiable reliance on Myriad's ATM-gene mutation classification and the other information contained in the 2024 Report, ultimately leading to Maureen's prophylactic bilateral mastectomy and prophylactic bilateral salpingo-oophorectomy.

101. Myriad failed to exercise reasonable care in determining whether the available evidence justified the representations in the 2024 Report, and those representations directly and proximately caused Maureen to elect the surgical interventions identified in the paragraph above.

102. Maureen would not have undergone the surgeries had Myriad classified the ATM-gene mutation as a VUS with uncertain clinical significance in the 2024 Report.

103. Myriad's negligent misrepresentation damaged Maureen in an amount to be adduced at trial.

**CAUSE OF ACTION FOUR: STRICT PRODUCTS LIABILITY (MAUREEN KITCHEN'S CLAIM)**

104. Maureen restates and realleges paragraphs 1–78 and 87–89 as if fully set forth herein.

105. MyRisk, through its incorporation of MyVision and its proprietary components, contains aspects that constitute an algorithmic product.

106. Myriad designed MyRisk to promote its business goals and features the product prominently among its line of screening tools on its website, shown below:




107. Myriad made design choices for MyRisk, including the design of the MyVision Variant Reclassification Program and its algorithmic component, Pheno.

108. Myriad has made design choices in its "enhancements" of traditional tools like literature review, even branding these design choices. The Myriad literature review method is branded LitView.

109. Myriad placed MyRisk into the stream of commerce by marketing the product to healthcare providers and patients, and Myriad generates millions of dollars in annual revenue from these transactions.

110. Myriad is in the best position to control the risk of harm associated with producing false positive results.

111. Myriad is in the best position to control the risk of harm associated with misclassifying a VUS as "clinically significant."

112. The risk of misclassifying a VUS as clinically significant made MyRisk abnormally dangerous because of the foreseeable and anticipated reliance on the genetic testing results to guide patients' and healthcare providers' health discussions and treatment plans.

113. Myriad exclusively controls the means of MyRisk genetic testing and its proprietary components.

114. Because of a defect in the design of MyRisk, as the product existed when Maureen Kitchen's blood sample was tested, every person who, like Maureen Kitchen, has a c.6975G>C (p.Ala2325Ala) mutation of the ATM gene received the false report that their mutation was clinically significant.

115. The classification of the c.6975G>C (p.Ala2325Ala) mutation as clinically significant was a substantial factor in Myriad's conclusion that Maureen Kitchen was at "HIGH RISK" for developing breast cancer.

116. The classifications and associated cancer risk information Myriad produced to Maureen Kitchen in the 2024 Report were substantial factors in her decision to undergo prophylactic bilateral mastectomy and prophylactic bilateral salpingo-oophorectomy.

117. Maureen Kitchen has been damaged in the ways described in paragraphs 88 and 89 and is entitled to an award of the special and general damages described therein.

**CAUSE OF ACTION THREE: LOSS OF CONSORTIUM**
**(JOSH KITCHEN'S CLAIM)**

118. Josh Kitchen restates and realleges paragraphs 1–78 and 87–89 as if fully set forth herein.

119. At the time of Myriad's negligent misclassification of the ATM-gene mutation, Maureen and Josh Kitchen were married and they continue to be married.

120. Because of Myriad's negligent misclassification of the ATM-gene mutation, Maureen and Josh Kitchen have been caused to suffer, and will continue to suffer in the future, loss of consortium, society, affection, and assistance, all to the detriment of their marital relationship.

121. Myriad's negligent misclassification of the ATM-gene mutation directly and proximately caused all the injuries and damages to the marriage.

**PRAYER FOR RELIEF**

WHEREFORE, Maureen and Josh Kitchen, Plaintiffs, pray this Court enter judgment against the Defendants, Myriad, jointly and severally, and award the following relief:

A. Not less than $226,688.97 for medical expenses;

B. Lost wages, to be proven at trial;

C. General damages for pain, suffering, and mental anguish;

D. Punitive damages;

E. Exemplary damages;

F. Pre- and post-judgment interest;

G. Reasonable attorney fees; and

H. Any other relief this Court finds just and equitable.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues triable to a jury.

Submitted this 29th day of October 2026.

**MAUREEN KITCHEN AND JOSH KITCHEN,**
Plaintiffs.

BY: _/s/ Audrey R. Svane_________

Audrey R. Svane, #25830
Nolan J. Niehus, #27369
Nicholas L. Marti, #28761
WOODS AITKEN LLP
301 South 13th Street, Suite 500
Lincoln, NE 68508
Telephone: (402) 437-8500
asvane@woodsaitken.com
nniehus@woodsaitken.com
nmarti@woodsaitken.com
*Attorneys for Plaintiffs*